*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MICHAEL W., | ) |
| | ) Supreme Court No. S-16662 |
| Appellant, | ) |
| | ) Superior Court No. 1KE-17-00018 PR |
| v. | ) |
| | ) O P I N I O N |
| TINA BROWN and ROBERT BROWN, | ) |
| | ) No. 7312 – November 2, 2018 |
| | ) |
| Appellees. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Trevor Stephens, Judge.

Appearances: Larissa Hail, Law Offices of Dan Allan & Associates, Anchorage, for Appellant. Gabriel E. Sassoon, Baxter Bruce & Sullivan P.C., Juneau, for Appellees.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

The superior court appointed a child's grandparents as his guardians after finding that the father's parental rights of custody had been suspended by circumstances because it would be detrimental to the child's welfare to remove the child from the grandparents' care. The father appeals.

We conclude that the phrase "suspended by circumstances" in the guardianship statute, AS 13.26.132, is properly focused on the parent's ability to accept the rights and responsibilities of parenthood rather than on the child's welfare. Because the superior court found that the father was not an unfit parent and had not abandoned the child, it was error to find that all his parental rights of custody had been suspended by circumstances. We therefore vacate the guardianship order and remand to the superior court with instructions to dismiss the grandparents' guardianship petition.

## II. FACTS AND PROCEEDINGS

### A. Facts

The essential facts of this case are not disputed. Michael W. and Mindy B. married in February 1999 and are the parents of Kevin, born in 2005. Kevin's grandparents, Tina and Robert Brown[1] — Mindy's mother and stepfather — live in Alaska.

Michael and Mindy separated and in July 2010 obtained a dissolution of marriage in Oregon. The dissolution order awarded Mindy primary physical custody of Kevin and gave Michael visitation rights during some of Kevin's school breaks. Mindy and Kevin moved to Alaska to be near the Browns, and Michael moved to New York to be near his father.

Both Michael and Mindy acquired new families. Michael married again and lives near Rochester, New York, with his wife, daughter, and stepdaughter. Mindy also married again and has a daughter, Faith.

After the dissolution Michael tried to call Kevin regularly, though he testified there were many times Mindy failed to answer her cell phone, and he sometimes had to ask for her new husband's help in reaching Kevin. At the time of the guardianship

---

[1] We use pseudonyms to protect the parties' privacy.

hearing — March 2017 — Michael's last in-person visit with Kevin was in October 2013, when he and his family attended Mindy's wedding in Kentucky. Michael had not seen Kevin for at least two years before that. But Michael testified that he kept track of Kevin's progress in school, checked his grades and medical records, and spoke with his doctor. He testified that he tried to arrange for Kevin to visit him in New York several times "but Mindy had an excuse why [Kevin] could not go." He never sought judicial assistance in enforcing his visitation rights, however, and Kevin had never been to New York.

At the time of the guardianship hearing Kevin was 12 years old, a 5th grade honor roll student, and one of the the school's morning greeters. He had friends and was well liked. He had been diagnosed with Asperger's Syndrome in 2011 but apparently did not manifest "the significant social and behavioral problems often associated with the condition."

Mindy had serious problems with alcohol, and in July 2016 she moved to Arizona to enter a rehabilitation program. Her husband accompanied her, but they left both Kevin and Faith in the Browns' care in Alaska. The Browns already had a close relationship with Kevin, as he had been spending at least two or three days a week at their house.

The Browns contacted Michael within the first month of Mindy's departure to inform him of the situation; he had not been aware of her alcohol problems. Michael told the Browns that he loved and missed Kevin but thought they would be great guardians. He did not ask them to send Kevin to New York, nor did he seek judicial assistance at that time to obtain custody.

Michael did continue his regular telephone contact with Kevin. The Browns facilitated his weekly calls, "sent him [Kevin's] school pictures, and . . . encouraged [Kevin] to write to Michael and send him thank you notes." In the meantime

the Browns provided Kevin with a safe, stable, and secure home in Alaska. They were aware of Kevin's special needs and were capable of meeting them. They had already been appointed guardians for Mindy's daughter, Faith, with whom Kevin also had a close sibling relationship.

Although at the time of the hearing there had still been no in-person visitation between Michael and Kevin since 2013, the Browns testified that they planned to facilitate visitation "in order to re-establish and strengthen [the] father/son relationship." They did not know Michael opposed their wish to become Kevin's guardians until he filed an opposition to their petition the day before the hearing.

Michael testified that he was employed full-time as a journeyman union carpenter, and his wife was a receptionist at a medical office. He had no criminal record, had no substance abuse issues, and was current on child support. There was no evidence of domestic violence in his home. He testified that he had located a school in his community that Kevin could attend, contacted a nearby autism center to help address Kevin's special needs, and found a pediatrician willing to accept Kevin as a patient. He described activities he hoped to share with his son, including travel and visits to theme parks, Niagara Falls, and museums.

### B.    Proceedings

The Browns' petition, filed in January 2017, sought their appointment as Kevin's guardians pursuant to AS 13.26.132. Michael opposed the petition and moved to dismiss the case. Michael and both of the Browns testified at the March hearing.

A few days later the superior court issued a detailed order denying Michael's motion to dismiss and granting the Browns' petition for guardianship. The court first considered whether the same standards that apply in a custody dispute between a parent and a non-parent should apply to a guardianship proceeding — specifically whether the Browns should be required "to prove by clear and convincing evidence that

all of Michael's and Mindy's rights of custody with respect to [Kevin] have been terminated or suspended by the circumstances because they are unfit parents, it would be detrimental to [Kevin's] welfare to not be in the [Browns'] custody and to be in the custody of either parent, or they have abandoned [Kevin]." The court concluded that the same standards should apply. It found that all three grounds for finding that parental rights were "suspended by circumstances" applied with respect to Mindy: she was an unfit parent because of her substance abuse issues; it would be detrimental to Kevin's welfare for him to leave the Browns' care and live with her because the Browns were his psychological parents[2] and he "would be emotionally and psychologically devastated and at substantial risk of not having his physical needs properly met"; and she had abandoned Kevin when she moved to Arizona with no plans for taking him back into her care.

With respect to Michael, the court found that only one of the three grounds was satisfied. The court found that the Browns had not proven he was an unfit parent. It also found that although the Browns had shown that Michael abandoned Kevin "for substantial periods of time since 2010," they did not establish that he had "totally abandoned" the child. However, the court found that the Browns had proven "that it would be detrimental to [Kevin's] welfare if he were to leave [the Browns'] care and live with Michael" because they were Kevin's psychological parents and "it would [be] devastating for [Kevin] emotionally and psychologically to go to New York to live with Michael," whom he had seen only rarely, "and be separated from the [Browns]."

---

[2] A "psychological parent" is "one who, on a day-to-day basis, . . . fulfills the child's psychological needs for an adult . . . . This relationship may exist between a child and any adult; it depends not upon the category into which the adult falls — biological, adoptive, foster, or common-law — but upon the quality and mutuality of the interaction." *Moore v. McGillis*, 408 P.3d 1196, 1198 n.1 (Alaska 2018) (quoting *Evans v. McTaggart*, 88 P.3d 1078, 1082 (Alaska 2004)).

The court concluded that both Mindy's and Michael's parental rights to custody had been "at least suspended by circumstance," allowing the guardianship petition to go forward. The court then considered whether the Browns had met the requirement of AS 13.26.143 "to also prove that it is in [Kevin's] best interests that [the Browns] be appointed his guardians." Noting that neither the guardianship statute nor related case law defined "best interests" in the guardianship context, the court applied the best interests factors listed in AS 25.24.150(c) — which governs child custody cases — reasoning that "[a] guardianship is akin to a child custody case in important respects." Finding that all the relevant factors weighed in favor of the Browns, the court concluded that it was in Kevin's best interests that the Browns be appointed as his guardians.

Michael timely appealed from this order. Mindy did not appeal and has not participated in this appeal.

## III.  STANDARDS OF REVIEW

We review statutory interpretations de novo.[3]  "We interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.' "[4]

## IV.  DISCUSSION

Michael's arguments on appeal fall into five categories:  (A) whether the superior court properly interpreted AS 13.26.132, authorizing appointment of a guardian only "if all parental rights of custody have been terminated or suspended"; (B) whether

---

[3]  *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 550 (Alaska 2017) ("Alaska Statute 13.26.045 does not define 'suspended' and the parties dispute its meaning; we consider the meaning of a statutory term de novo." (citations omitted)).

[4]  *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

the evidence supported the court's conclusion that Michael's custodial rights had been suspended by circumstances; (C) whether the court gave sufficient weight to Michael's constitutional right to parent his child; (D) whether the court erred by allowing Kevin to remain in the courtroom during the guardianship hearing; and (E) whether the court erred when it relied on Kevin's courtroom demeanor in finding that it would be detrimental to his welfare to remove him from the Browns' custody.

Because we conclude that parental rights to custody cannot be "suspended by circumstances" based solely on a determination that returning the child to the parent's custody would be detrimental to the child's welfare — and reverse the superior court's decision on that ground — we need not decide Michael's other claims.[5]

A.    **"Suspended By Circumstances" Contemplates Circumstances That Deprive A Parent Of The Ability To Accept The Rights And Responsibilities Of Parenthood.**

The duty to support and protect children generally falls on their parents.[6] Indeed, parents have not only a duty but also "a fundamental [constitutional] right to

---

[5]    We do, however, note our serious disapproval of the superior court's reliance on Kevin's courtroom demeanor as evidence "that [Kevin] very much wants to remain with the Browns and was very upset at the prospect of going to New York to live with Michael and his family." Michael and both parties' counsel participated in the hearing telephonically, and at the end of it, when the court noted that Kevin had "been quite upset at different points in the hearing," Michael's counsel expressed surprise that Kevin had remained in the courtroom during the proceedings. It does not appear that Michael had notice that Kevin's in-court reaction to others' testimony was part of the evidence on which the court would rely in reaching its decision.

[6]    *See Matthews v. Matthews*, 739 P.2d 1298, 1299 (Alaska 1987) ("A parent is obligated both by statute and at common law to support his or her children.") (citing AS 25.20.030; *In re J.J.J.*, 718 P.2d 948, 949 (Alaska 1986)); *Sickel v. State*, 363 P.3d 115, 117 (Alaska App. 2015) (noting that "under the common law, parents have a duty to protect their minor children").

control the upbringing of their children."[7]  A court acting under Alaska's probate code thus "has no power to appoint a guardian at all if the minor has a living parent entitled to his custody."[8]  But "[t]he court may appoint a guardian for an unmarried minor if all parental rights of custody have been terminated or suspended by circumstances or prior court order."[9]

There is no court order in this case terminating or suspending all of Michael's parental rights of custody.  Our focus, therefore, is on whether all his rights of custody were suspended by circumstances.  The superior court held that they were; Michael contends this was error.

The superior court drew from child custody cases involving the claims of non-parents and analyzed the statute's phrase "suspended by circumstances" as encompassing the same three grounds we have identified as justifying non-parental custody:  parental unfitness, abandonment, and detriment to the child's welfare.[10]  The

---

[7]  *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 268 (Alaska 2004).

[8]  *In re Guardianship of Lupe C.*, 812 P.2d 365, 369 (N.M. App. 1991) (quoting 2 UNIFORM PROBATE CODE PRACTICE MANUAL 511 (Richard V. Wellman ed., 1977)); *see also* UNIF. PROBATE CODE § 5-204 cmt. 8 pt., 2 U.L.A. 336 (1998) ("The court [under the Probate Code] is not authorized to appoint a guardian for [a child] for whom a parent has custodial rights or for one who has a parental guardian.").  "Because Alaska adopted the Uniform Probate Code (UPC) 'in its entirety' in 1972, the UPC's commentary is 'instructive in interpreting the Alaska probate statutes.' "  *Hester v. Landau*, 420 P.3d 1285, 1287-88 (Alaska 2018) (citations omitted).

[9]  AS 13.26.132.

[10]  *See, e.g.*, *Abby D. v. Sue Y.*, 378 P.3d 388, 392 (Alaska 2016) (holding that to overcome biological-parent preference in custody dispute between parent and any third party, " 'the non-parent must show that it clearly would be detrimental to the child['s welfare] to permit the parent to have custody,' that the parent is unfit, or that the parent has abandoned the child" (quoting *Turner v. Pannick*, 540 P.2d 1051, 1054-55

(continued...)

court rejected the first two grounds in Michael's case. It held that the Browns had "not shown by clear and convincing evidence that Michael [was] an 'unfit' parent." As for abandonment, the court found that Michael abandoned Kevin "for substantial periods of time since 2010" but did not abandon him "totally." It concluded, on the other hand, that the Browns *did* prove abandonment by clear and convincing evidence as to Mindy, and we infer from this that the court did not find abandonment proven as to Michael.

The remaining ground for finding all of Michael's parental rights "suspended by circumstances," as the superior court defined the phrase, is that it would be detrimental to Kevin's welfare to be placed in Michael's custody. The court found this circumstance to exist. Finding that the Browns were Kevin's psychological parents, it reasoned that "it would be devastating for [Kevin] emotionally and psychologically to go to New York to live with Michael and be separated from the Browns" because of his closeness to the Browns (and his half-sister Faith, also in their care) and his lack of a close relationship with Michael and his family in New York.

We conclude, however, that "detriment to the child's welfare" alone does not support a finding that a parent's custodial rights have been suspended by circumstances for purposes of a guardianship appointment. Like other courts, we conclude that the phrase "suspended by circumstances" "must contemplate some set of circumstances which deprives a parent of the ability to accept the rights and responsibilities of parenthood."[11] The focus of this inquiry is not on the child's welfare but rather on the parent's ability to parent; that the child might do better with a different custodian does not mean that the parents have lost their custodial rights.

---

[10] (...continued) (Alaska 1975))).

[11] *In re Guardianship of J.S.L.F.*, 826 N.W.2d 916, 920 (N.D. 2013); *see also In re Guardianship of Copenhaver*, 865 P.2d 979, 984 (Idaho 1993).

We have addressed the phrase "suspended by circumstances" twice since AS 13.26.132 was enacted. In *R.R. v. State* we rejected a claim that the language was unconstitutionally vague, concluding that "the statute merely sets out circumstances under which a guardian can be appointed; the definition of such circumstances is found elsewhere in the statutes."[12] In *Jude M. v. State, Department of Health and Social Services, Office of Children's Services*, we held that a father's custodial rights were suspended by circumstances while his daughter, who had been adjudicated a child in need of aid, was in the custody of the Office of Children's Services (OCS).[13] We observed that "suspended" was not defined in AS 13.26.132 and turned to a dictionary definition: "To 'suspend' rights means to temporarily prevent their exercise."[14] We held that although the father retained residual rights under AS 47.10.084(c) while his child was in OCS custody, his custodial rights were suspended by circumstances because subsection (a) of the statute imposed "on OCS the daily custodial responsibilities that would otherwise be the parent's" and prevented the father from exercising the custodial rights that OCS had assumed.[15]

Other courts have more directly addressed the issue raised here. The Supreme Court of Idaho interpreted a guardianship statute identical to Alaska's in *Guardianship of Copenhaver*, concluding that " '[s]uspended by circumstances' must

---

[12]    919 P.2d 754, 758 (Alaska 1996), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078 (Alaska 2004).

[13]    394 P.3d 543, 550-51 (Alaska 2017).

[14]    *Id.* at 551 n.25 (" 'Suspend' means '[t]o interrupt; postpone; defer' or '[t]o temporarily keep (a person) from performing a function . . . or exercising a right or privilege.' ") (quoting *Suspend*, BLACK'S LAW DICTIONARY (10th ed. 2014)) (alterations in original).

[15]    *Id.* (citing AS 47.10.084(a)).

-10-                                        **7312**

contemplate some set of circumstances which deprives a parent of the ability to accept the rights and responsibilities of parenthood."[16] The case involved a mother who had left her two children with the Irwins, long-time "friends and babysitters of the minors."[17] The Irwins had exercised sole custody of the children for months while the mother was living transiently, struggling with alcohol and drug abuse, and unable to provide for the children financially.[18] The magistrate granted the Irwins' petition for a permanent guardianship.[19]

On appeal the Idaho Supreme Court began by rejecting the mother's argument that the guardianship order effectively terminated her parental rights; the court noted the differences between termination and guardianship proceedings and stated that "[a] guardianship proceeding is not meant to adjudicate custody of minors."[20] The court went on to observe that "[t]he paramount consideration in *any* dispute involving the custody and care of a minor child is the child's best interests."[21] But at the same time,

> [i]n custody disputes between a "non-parent" (*i.e.*, an individual who is neither legal nor natural parent) and a

---

[16] 865 P.2d at 984. In 1999 the Idaho legislature amended the guardianship statutes and replaced the "suspended by circumstances" language with a list of circumstances — including neglect, abuse, abandonment, or inability to provide stable home environment — a court must find before appointing a guardian. *See* 1999 Idaho Sess. Law ch. 123, § 1 (H.B. 76).

[17] *Id.* at 981.

[18] *Id.* at 980-81, 984.

[19] *Id.*

[20] *Id.* at 982 (citing *In re Guardianship of Diamond*, 707 P.2d 520, 522 (Idaho App.1985)).

[21] *Id.* at 983 (emphasis in original) (quoting *Stockwell v. Stockwell*, 775 P.2d 611, 613 (Idaho 1989)).

natural parent, Idaho courts apply a presumption that a natural parent should have custody as opposed to other lineal or collateral relatives or interested parties. This presumption *operates to preclude* consideration of the best interests of the child unless the nonparent demonstrates either that the natural parent has abandoned the child, that the natural parent is unfit or that the child has been in the nonparent's custody for an appreciable period of time.[22]

From these general custody rules the court distilled "the proper order of inquiry" in a contested guardianship proceeding involving a parent and non-relatives.[23] The court must first "apply the presumption that [the parent] should have custody as opposed to the [non-relative proposed guardians]."[24] If "this presumption is overcome by a showing that parental rights have been suspended by circumstances," only then should the court "ask whether the requested appointment will serve the welfare and best interests of the [child]."[25] If it will, then the court should make the appointment.[26]

As for what is meant by "suspended by circumstances," the Idaho Supreme Court noted — as we did in *Jude M.* — that the guardianship statutes "provide no guidance"; instead it extracted "a reasonable interpretation of the phrase" from other cases.[27] These addressed situations in which "a parent's whereabouts were unknown and

---

[22] *Id.* (emphasis added) (quoting *Stockwell*, 775 P.2d at 613).

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 984.

the parent was not providing care for the child";[28] "the parent either abandoned the child or [was] unfit to care for the child";[29] or the parent had "consented to the appointment of a guardian."[30] On the other hand, a parent's right to custody would not be "suspended by circumstances" when the parent had the "child in lawful custody, [was] present and [had] not relinquished physical custody."[31]

In the case before it, the Idaho court noted that despite the mother's difficulties she had made it clear "that she no longer desired to leave the children with the Irwins and that she was willing and capable of caring for them."[32] The court held that these facts did not support a finding that the mother's rights had been suspended by circumstances.[33] Therefore, the magistrate's "findings regarding the children's living situation, school enrollment, financial support and contact with their mother" — all relating to the children's best interests — "no longer had any bearing"; they related only to the second step in the analysis, which a court could reach only after the presumption in favor of the mother had been overcome by a finding that her custodial rights had been

---

[28]     *Id.* (citing *In re Guardianship of Diamond*, 707 P.2d 520, 522 (Idaho App. 1985)).

[29]     *Id.* (citing *In re Krystal S.*, 584 A.2d 672, 674 (Me. 1991)).

[30]     *Id.* (citing *Stansell v. Superior Court in and for Maricopa Cty.*, 607 P.2d 959, 960-61 (Ariz. 1980) (en banc)).

[31]     *Id. (*citing *In re Guardianship of Lupe C.*, 812 P.2d 365, 369 (N.M. App. 1991)).

[32]     *Id.*

[33]     *Id.* at 985.

suspended.[34] The court reversed the magistrate's decision and remanded the case "for an order terminating the guardianship and returning the children immediately to the custody of their mother."[35]

Other courts have interpreted the same statutory language in essentially the same way, focusing on conduct of the parent: abandonment, unfitness, or consent to the guardianship.[36] The fact that the child is attached to a non-parent — even a psychological parent, as in this case — and is doing well in the non-parent's care does not operate to suspend the natural parent's custodial rights.[37]

---

[34] *Id.*

[35] *Id.*

[36] *E.g.*, *Guardianship of Zachary Z.*, 677 A.2d 550, 553 (Me. 1996) ("A finding that parental rights have been terminated by circumstances may be established by circumstances of abandonment or unfitness to parent.")*; In re Guardianship of Jordan M.*, 820 N.W.2d 654, 661 (Neb. App. 2012) ("[A]n individual who seeks appointment as guardian of a minor child over the objection of a biological or adoptive parent bears the burden of proving by clear and convincing evidence that the biological or adoptive parent is unfit or has forfeited his or her right to custody."); *In re Guardianship of Ashleigh R.*, 55 P.3d 984, 988 (N.M. App. 2002) ("[A] parent's custodial rights have been 'suspended by circumstances' only when (1) the parent consents to the appointment of a guardian or (2) the parent's whereabouts are unknown."); *In re Guardianship of J.S.L.F.*, 826 N.W.2d 916, 920 (N.D. 2013) (considering *Guardianship of Copenhaver*'s definition of "suspended by circumstances" persuasive); *see also In re Guardianship & Conservatorship of J.C.*, 157 P.3d 1130, 1134-35 (Mont. 2007) (implying that clear and convincing evidence of either unfitness or abandonment would satisfy "suspended by circumstances" standard).

[37] *Cf. Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 551 (Alaska 2017) (rejecting argument that "any child custody order granting 'one parent sole legal and physical custody' suspends the noncustodial parent's rights").

Like the Idaho Supreme Court in *Guardianship of Copenhaver*, we hold that when a parent opposes a non-parent's petition for guardianship of a minor, "the proper order of inquiry" is as follows.[38] First, the court must apply the biological-parent preference.[39] The preference may be overcome only if all the parent's "rights of custody have been terminated or suspended by circumstances or prior court order."[40] The phrase "suspended by circumstances" contemplates "some set of circumstances which deprives a parent of the ability to accept the rights and responsibilities of parenthood."[41] Notably, this is a different test for overcoming the biological-parent preference than applies in the usual context of a custody dispute between parents and non-parents, where the court may consider — in addition to unfitness and abandonment — whether "it clearly would be detrimental to the child['s welfare] to permit the parent to have custody."[42] The child's welfare may certainly be considered when it is *the parent's conduct* that poses the potential detriment. But this falls within "parental unfitness," and in this case the superior court expressly rejected such a finding, concluding that the Browns had not proven that Michael was an unfit parent.[43] The focus of the court's discussion of Kevin's

---

[38]     865 P.2d at 983-84.

[39]     *Id.* at 983; *see Abby D. v. Sue Y.*, 378 P.3d 388, 392 (Alaska 2016) ("In its initial resolution of a custody dispute between a biological parent and any third party, including a grandparent, the court must prefer the biological parent.").

[40]     AS 13.26.132; *Guardianship of Copenhaver*, 865 P.2d at 983.

[41]     *Guardianship of Copenhaver*, 865 P.2d at 984.

[42]     *Abby D.*, 378 P.3d at 392 (quoting *Turner v. Pannick*, 540 P.2d 1051, 1053-54 (Alaska 1975)).

[43]     We note that courts disagree about whether a court may lawfully make a determination of parental fitness in the course of deciding a guardianship petition or

(continued...)

welfare was the significance of his attachment to the Browns on the one hand and lack of attachment to Michael on the other. The result of that weighing exercise — the child's supposed preference for one family over the other — cannot mean Michael's loss of "all parental rights of custody."

As the second step of the inquiry in a guardianship proceeding, if the court has already found by clear and convincing evidence that all the custodial rights of the parent have been suspended, then the court must determine whether the appointment would be in the best interests of the child.[44] If these requirements are met, then the court may make the appointment.[45]

We conclude, therefore, that in this case the superior court erred when it relied solely on detriment to Kevin's welfare to determine that all of Michael's parental rights of custody had been suspended by circumstances. We accordingly vacate the guardianship order and remand to the superior court with instructions to grant Michael's motion to dismiss the Browns' petition.

---

[43]    (...continued)
whether such a finding must be made elsewhere, in child custody and child in need of aid proceedings. *Compare In re Guardianship of J.S.L.F.*, 826 N.W.2d 916, 920 (N.D. 2013) (holding "that a guardianship proceeding is an inappropriate method to test the fitness of [a] parent" because "the guardianship provisions of the Uniform Probate Code were not intended to replace the previously existing law regarding custody"), *with In re Guardianship & Conservatorship of J.C.*, 157 P.3d 1130, 1135 (Mont. 2007) (holding that the probate code "does allow a district court to determine, in a guardianship proceeding, that a parent's rights are suspended by circumstances" and affirming the court's finding that "[g]iven the clear and convincing evidence that [the mother] was not fit to care for her children, the court was justified in concluding that her parental rights were suspended by circumstances despite [her] belated assertion of her custodial rights.") The issue is not before us on this appeal.

[44]    AS 13.26.143; *see also Guardianship of Copenhaver*, 865 P.2d at 983.

[45]    AS 13.26.143; *see also Guardianship of Copenhaver*, 865 P.2d at 983-84.

## V.    CONCLUSION

We VACATE the superior court's order granting the Browns' guardianship petition and REMAND to the superior court with instructions to grant Michael's motion to dismiss the petition.